RECEIPT NUMBER

*517562*

*26*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JOHN HARRINGTON,
ANDRA OUNDRA, and
KAREN WARD ,
as Individuals and on behalf of others
similarly situated,

**04-74654**

     Plaintiffs,

**CLASS ACTION**

vs.

UNITED STATES STEEL CORPORATION,
a Delaware corporation,

Case No.
Hon. PATRICK J. DUGGAN

MAGISTRATE JUDGE MONA K. MAJZOUB

     Defendant.

---

**CHARFOOS & CHRISTENSON, P.C.**
Jason J. Thompson P-47184
L. S. Charfoos P-11799
Attorneys for Plaintiffs
5510 Woodward Avenue
Detroit, Michigan 48202
(313) 875-8080

**BERRY MOORMAN P.C.**
Hugh B. Thomas P-40884
James P. Murphy P-36728
Attorneys for Plaintiffs
535 Griswold, Suite 1900
Detroit, Michigan 48226
(313) 496-1200

**DAVID A. BOWER, P.C.**
David A. Bower P-38004
Attorneys for Plaintiffs
10600 W. Jefferson #204
P.O. Box 18190
River Rouge, Michigan 48218
(313) 842-1292

FILED

U.S. DIST COURT CLERK
EAST DIST.MICH.
DETROIT-PSG

'04 NOV 30 A10 36

---

## CLASS ACTION COMPLAINT – JURY TRIAL DEMAND

A civil action between these parties
or other parties arising out of the
transaction or occurrence alleged in
the Complaint has been previously
filed in this Court, where it was
given the docket number *04-74653*
and was assigned to Judge *AVERN COHN*

_____
JASON J. THOMPSON (P47184)
Attorneys for Plaintiff

Plaintiffs John Harrington, Andra Oundra, and Karen Ward, on behalf of themselves and all others similarly situated, by their attorneys, Charfoos & Christensen, P.C., Berry Moorman P.C., and , David A. Bower, P.C. aver as follows.

## OVERVIEW

1.      Plaintiffs assert the claims pursuant to the Michigan Natural Resources and Environmental Protection Act, Michigan common law for damages and request monetary and relief for statutory violations and common-law liability arising from the operation of United States Steel Corporation's Ecorse, Michigan Steel Plant and the release and discharge of air particulate matter in the process of steel manufacturing, and other toxic and hazardous substances.

2.      This action involves air pollution emitted from Defendants steel plant that causes property damage, potential health risks and nuisance damages in violation of Federal and State Law.  Plaintiffs have observed metal-like dust and flakes falling from the sky that coat their homes, cars, and outdoor furniture and is drawn into their homes covering their personal property.  The pollution causes damage and interference with

plaintiffs' use and enjoyment of their property and otherwise disturbs their normal lifestyle and presents a public health risk.

## PARTIES, JURISIDICTION AND VENUE

3.    Plaintiff John Harrington, is an individual residing within the jurisdictional boundaries of the City of River Rouge.

4.    Plaintiff Andra Oundra is an individual residing within the jurisdictional boundaries of the City of Ecorse.

5.    Plaintiff Karen Ward is an individual residing within the jurisdictional boundaries of the City of River Rouge.

6.    Defendant United States Steel Corporation ("USSC") is a foreign corporation organized and existing under the laws of the State of Delaware, maintains its principal place of business in the State of Pennsylvania.

7.    Defendant operates a steel processing plant known as United States Steel, Great Lakes Works, located at One Quality Drive, Ecorse, Michigan within the jurisdictional boundaries of the Eastern District of Michigan.

8.    Plaintiff's and Defendant are completely diverse therefore this Court has diversity jurisdiction pursuant to 23 U.S.C. 1332.

9.    The amount in controversy exceeds the sum of $75,000 for all class members and the Court has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a). See Olden v. LaFarge Corp., 383 F.3Rd 495 (6th Cir 2004).

## FACTUAL ALLEGATIONS

### DEFENDANT'S STEEL MANUFACTURING

10.    Defendant owns and operates a steel plant that it purchased on May 20, 2003, from National Steel Corp as part of their bankruptcy proceeding. The plant is now known as United States Steel, Great Lakes Works (USSGLW)

11.    Great Lakes Works is situated along the Detroit River in the cities of Ecorse and River Rouge, Michigan. It consists of approximately 1,100 acres and has both steel making and finishing facilities, making it one of five integrated steel making facilities U. S. Steel operates in the United States. Sheet products primarily for use in the automotive industry are manufactured at Great Lakes Works. Products include hot rolled, cold rolled, electrolytic galvanized, hot dip galvanized and high-strength, low-allow steel.

12.    The iron ore and coke are combined with limestone in the blast furnaces. The molten iron that emerges is sent on to basic oxygen furnaces where steel scrap is added and carbon and other impurities are removed by the injection of oxygen during what is called a basic oxygen process or BOP. After leaving the "BOP shop," the steel is further refined before being poured into continuous casters, which form the slabs from which all flat steel products are made.

13.    Defendant's present annual raw steel making capacity at Great Lakes Works is 3.5 million tons and its facilities include:

- Three Blast Furnaces
- Two BOP Vessels
- Vacuum Degasser
- Ladle Metallurgy Facility

- Two Continuous Casters
- 80" Hot Strip Mill
- Pickle Line
- 80" Tandem Cold Reduction Mill
- Batch Anneal
- Temper Mill
- Electrogalvanizing Line
- Continuous Galvanizing Line

14.    The manufacturing process utilized by Defendant produces well known pollutants, including manganese, benzene, chromium, copper, mercury, lead, and zinc to name a few. Furthermore, the process can produce material called "kish", commonly described as a metal-like dust coating that covers everything within the fallout area.

15.    The plant operates very old equipment with very poor pollution controls.

### FEDERAL POLLUTION DATA

16.    Pursuant to Federal law, Defendant is required to report the identity and quantity of certain toxins released into the environment during its operation. The information is called Toxic Release Inventory (TRI) data and it is maintained by the United States Environmental Protection Agency (EPA). This inventory was established under the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) and expanded by the Pollution Prevention Act of 1990.

17.    The TRI data can be used to identify sources of pollution, determine quantities of emissions, and measure progress in pollution control measures enacted from year to year. The data can be used to assess potential environmental exposure and risk to public health.

18.    The TRI data for Defendant identifies the amount of toxins released during the steel making process, including manganese, benzene, chromium, copper, mercury, lead, and zinc.  For example, 10,700 pounds (lbs.) of manganese compounds were released into the air in 2002; 8,600 lbs. in 2001; 9,400 lbs. in 2000; and 9,400 lbs. in 1999 from the Ecorse steel plant while operated by National Steel.

## AMBIENT AIR SAMPLING and TESTING RESULTS
## WITHIN the CITY of RIVER ROUGE

**A.    City of River Rouge Ambient Air Testing**

19.    Ambient air sampling and testing demonstrates how much of a compound is in the air at a given location in a given period of time.  Federal and State pollution laws set limits for pollutant concentrations in ambient air.

20.    The City of River Rouge has paid for accredited and industry standard ambient air testing within the City of River Rouge to determine whether Defendant has violated environmental laws and put the public at risk for health problems.

21.    Integrated Environmental, Inc. (Integrated), an environmental consulting company based in Livonia, Michigan conducted ambient air testing at 150 E. Great Lakes Avenue, River Rouge, Michigan.  Using high-volume air sampling equipment, Integrated tested for Semi-volatile Organic Compounds, Carbonyl compounds, and Total Suspended Air Particulate (TSP) with metal analysis.

22.    Samples collected on October 8 and 24, and November 4, 2000 indicated the presence of the following U.S. Steel pollutants: benzene, chromium, lead, manganese, particulate and zinc to name a few.  These sample results demonstrate the

presence of Defendant's steel plant pollutants in the ambient air within the community of River Rouge.

23.    Testing in 2003 and 2004 produced similar results including concentrations of the toxic substance manganese emitted by the U.S. Steel facility at concentrations that exceed the health standard.

**B.    Michigan Department of Environmental Quality Test Results**

24.    The Michigan Department of Environmental Quality (MDEQ) maintains an ambient air sampling machine at 315 South Genesse Street, River Rouge, Michigan. The station samples for air pollutants such as VOCs, carbonyl compounds and metals.

25.    The 2000 Annual Air Quality Report for Michigan published by the MDEQ indicates the presence of the U.S. Steel facility pollutants benzene, chromium, lead, copper, manganese, particulate and zinc to name a few.

26.    Testing results in 2001, 2002, and 2003 produced similar results. These samples provide information about Defendant's steel plant and permit better analysis of current data.

**C.    Comparison of MDEQ and City of River Rouge Ambient Air Sample Test Data**

27.    Comparison of the MDEQ test results and those from the City of River Rouge produces a consistent picture of the U.S. Steel pollutant manganese emission in the ambient air in the City of River Rouge.

- The number of samples with manganese present at the MDEQ station in 2000 was 27 of 27; in 2001 was 48 of 48; in 2002 was 54 of 54; in 2003 was 55 of 55.

- The number of samples with manganese present at the City testing station in 2000 was 3 of 3; in 2003 was 15 of 15; and in 2004 was 28 of 28.

28.    Further, the test data confirms the presence of manganese at concentrations that exceed the health based standard established by the MDEQ pursuant to the Federal Clean Air Act.

- In 2000, at least 6 samples had excessive levels.
- In 2001, at least 3 samples had excessive levels.
- In 2002, at least 3 samples had excessive levels.
- In 2003, at least 4 samples had excessive levels.
- In 2004, 21 of 43 samples had excessive levels.

D.    **City of River Rouge Fall Out Sampling Testing Results**

29.    The City of River Rouge has paid for accredited and industry standard Dust Fall testing within the City of River Rouge to determine whether Defendant has violated environmental laws and put the public at risk for health problems.

30.    Integrated Environmental, Inc., an environmental consulting company based in Livonia, Michigan has conducted sampling at 75 Stoner Street, River Rouge, Michigan. The sampling was constructed pursuant to the American Society for Testing Materials (ASTM) standard. D 1739-98.

31.    Samples were collected on a monthly basis between October 31, 2003 and October 11, 2004. The results indicated the presence of chromium, lead, manganese, zinc and copper to name a few. These samples provide information about Defendant's steel plant and permit better analysis of current data.

32.    Furthermore, per the ASTM standard, the sampling station was elevated 2 meters above the ground surface. The sample test results therefore are representative of

particulate fallout from the air and not the re-suspension substances present on the ground.

## VIOLATIONS and CITATIONS of USSGLW

33.    The MDEQ has cited U.S. Steel for violations of the Clean Air Act since they assumed ownership and control of the Ecorse steel plant. For example:

**A.    The March 4, 2004 Letter of Violation**

34.    On March 4, 2004 Bernardo Sia, Senior Environmental Engineer of the Air Quality Control Division of the MDEQ issued a Letter of Violation to Defendant. Defendant was cited for violating its Permit to Install No. 256-02. The permit was issued for A, B, and D Blast Furnaces and set forth the combined production limits for the three furnaces. The permit required testing within one year to determine levels of particulate matter emissions. Blast Furnace A had not commenced trial operation, and testing for furnace B was four months overdue.

35.    The Letter of Violation advised Defendant that its "B Blast Furnace cast house emissions control cannot maintain continuous compliance with the applicable PM emission limits" due to Defendants "Failure to install, maintain and operate in a satisfactory manner proper air pollution control equipment…"

36.    The Letter of Violation also referenced a February 6, 2004 letter from Defendant to the MDEQ that its No 5 Coke Oven Battery Quench Tower Baffels were not properly maintained and were in need of repair or replacement. The Coke Battery Tower caused "particulate fallout" on Mr. Sia's car during an inspection. Violations were issued at that time. Due to the lack of response to the mentioned violations by Defendant, the

matter was sent to the Air Quality Control Enforcement Division of the MDEQ.

37.    On March 30, 2004 Defendant responded to the March 4, Letter of Violation and described failed pollution control equipment as the reason for the emission violations and problems.  Defendant explained that to fix the problems, a work interruption would be required.  Defendant promised to commence replacement of the defective equipment no latter than October 31, 2004.

**B. The March 29, 2004 Notice of Violation of the Site Implementation Plan**

38.    On March 29th, 2004 Stephen Rothblatt of the United State Environmental Protection Agency sent Defendant a Notice of Violation advising them that they were violating the Michigan State Implementation Plan (SIP).

39.    Defendant was in violation of requirements concerning its hot metal desulfurization units.

40.    Pursuant to 42 U.S.C § 7413, the EPA had the option of issuing an administrative compliance order, issuance of an administrative penalty order, or bringing a judicial criminal or civil action against Defendant.  Before deciding what sanction to issue, the EPA ordered a conference with Defendants engineers and management.

**C.    The April 1, 2004 Letter of Violation**

41.    On April 1, 2004 the MDEQ issued another Letter of violation to Defendant. This time the violation was based on certified visible opacity emission reading of emissions coming from the roof monitors of the Basic Oxygen Furnace.

42.    Opacity readings are standard tests of the ability of light to travel through air pollution over a given time period.  The greater the pollution, the higher the opacity reading.  A high opacity reading is evidence of excessive air pollution.

43.    Visible emissions for the furnace were greater than the 20% opacity limit.

44.    The 6 minute average reading from the Basic Oxygen Furnace was 51.25%, which is more than 2.5 times the acceptable limit of 20%.

45.    The roof monitors recorded a 100% opacity reading with a "thick brownish color".

46.    Defendant was instructed to take corrective action but the problem went uncorrected.

**D.    The April 1, 2004 Request for Escalated Enforcement Action**

47.    On April 1 2004, Teresa Seidel, Enforcement Unit Supervisor of the MDEQ, requested that "escalated enforcement action" be taken against Defendant, including specifically, entering into a consent order for violation of R910. Special conditions of Permit to Install No. 256-02, 414-96, C-6426, and C-7070 due to the length of time for compliance involved.

48.    A consent order is usually reserved for a final sanction in situations where a polluter fails to respond to less severe measures.   Often fines are imposed and corrective measures are forced onto the resistant polluter.

49.    The letter requesting the enforcement action set forth a detailed history of the actions and violations leading up to and supporting the request.  Many of those letters and actions are in addition to the above references.

50.    USSGLW stated that they were 100% committed to environmental

compliance and promised to take measures to stop polluting in violation of the law. However, the conclusion was that "...since achieving compliance would take almost two years, a legally binding instrument such as a Consent Order should be entered with the company".

**E.    The April 20, 2004 Letter of Violation**

51.    On April 20, 2004 the MDEQ issued another Letter of violation to Defendant.  This time the violation was based on testing of Defendant's ESP stack. Again, the testing showed violations of opacity limits.

52.    The six-minute opacity reading observed from the ESP stack was 56.4, which is almost 3 times the acceptable limit of 20%.

53.    Defendant was instructed to take corrective action but the problem went uncorrected.

**F.    USSGLW is Placed on the USEPA's High Priority Violators List**

54.    On April 21, 2004, Ronald J. Pollum of the Enforcement Unit of the DEQ, Air Quality Division advised Defendant that their protracted failure to remedy the above outlined violations, were of Federal significance.

55.    Defendant was placed on the USEPA's High Priority Violators List.

56.    Defendant was required to meet and discuss necessary corrective actions to be removed from the list, or face prosecution by the Attorney General and/or judicial proceeding under the Clean Air Act.

**G.    The June 28th Letter of Violation**

57.    On June 28th, 2004 Defendant was again sent a Letter of Violation from the MDEQ.  This time a visible emission from Defendants BOF electrostatic precipitator stack.

58.    The six-minute average opacity reading was 81.88%, which is more than 4 times the acceptable limit of 20%.

59.    Defendant was instructed to take corrective action but the problem went uncorrected.

**H.    The August 24th Letter of Violation**

60.    On August 28th, 2004 Defendant was again sent a Letter of Violation from the MDEQ.  This time two more visible emissions from Defendants BOF electrostatic precipitator stack exceeded the limits.

61.    On 8/17/04 the six-minute average opacity reading was 63.125% and on 8/18/04, which is more than 3 times the acceptable limit and the six-minute average reading was 77.50%, which is almost 4 times the acceptable limit.

62.    Defendant was instructed to take corrective action but the problem went uncorrected.

**I.    The October 4, 2004 Letter of Violation**

63.    On October 4, 2004, Defendant was again sent a Letter of Violation for excessive air emissions.  This time, tests performed on the Blast Furnace D for fugitive dust emissions revealed a lack of compliance with applicable standards.

64.     Defendant was instructed to take corrective action but the problem went uncorrected.

## CITIZEN COMPLAINTS of AIR POLLUTION

65.     There have been numerous complaints of Defendants air pollution filed by citizens living in the surrounding communities.

66.     In addition, several National Response Center Incident Reports have been filed by Defendant because of their air pollution.

67.     The reports reveal that equipment and/or personnel failures result in emissions and leaks of dangerous chemicals such as benzene, coke oven failures, coke oven gas releases and other problems all documented in public records.

68.     Complaints have been logged with the Pollution Emergency Alert System (PEAS) describing "a huge plume of smoke orange in color moving into Canada" from Defendants plant.

69.     On June 25th, 2004 the Canadian Ministry of the Environment investigated complaints of "metallic like fallout" on vehicles in LaSalle Canada.  The police collected samples and they were tested.  The material was graphite with iron oxide, known as "kish flakes" which is typical of a steel foundry.

70.     On June 14, 2003 an Ecorse resident filed a complaint with the MDEQ regarding her house, car and body being covered with "kish".  Samples of shinny particles were collected from inside the resident's house and pictures were taken.  Test results again confirmed metallic oxide particles, kish.

71.    On May 15, 2003 two Ecorse residents filed complaints with the MDEQ. One resident reported that while hosting an outdoor dinner a "mist of metal shavings" fell from the sky. It was described "like pencil lead". It "contaminated the food and landed everywhere". The other resident described the situation "like it was snowing graphite". He said the fallout landed on cars, lawns, and sidewalks.

72.    The public records contain more complaints of a similar nature.


## PUBLIC HEALTH

73.    The public health risks of manganese are well known. Of significance is the risk of respiratory and pulmonary harm and a Parkinson-like condition identified by the medical community as manganism.

74.    Some of the most dangerous particulate to human health is the PM-10 fraction (i.e., "respirable"; Particulate Matter with a nominal aerodynamic diameter of 10 microns).

75.    The City of River Rouge testing reveals the existence of manganese in the PM-10 fraction at a concentration that exceeds the health standard.

76.    Manganism has been documented for over 100 years. Manganism causes neurological disruption and symptoms similar to those associated with Parkinson's Diseases.

77.    The EPA's Office of Air Quality Planning and Standards, for a hazard ranking under Section 112(g) of the Clean Air Act Amendments, considers manganese to be a "high concern" pollutant based on severe chronic toxicity (U.S. Environmental Protection Agency. *Technical Background Document to Support Rulemaking Pursuant to*

*the Clean Air Act Section 112(g). Ranking of Pollutants with Respect to Hazard to Human Health.* Emissions Standards Division, Office of Air Quality Planning and Standards, Research Triangle Park, NC. 1994.)

78.    The World Health Organization Geneva, 1999 report entitled, *Manganese and Its Compounds, Concise International Chemical Assessment Document 12,* was published under the joint sponsorship of the United Nations Environment Programme, the International Labour Organisation, and the World Health Organization.  It reported as follows:

- In chronic inhalation exposure to manganese, the main organ systems affected are the lungs, nervous system, and reproductive system, although effects on other organ systems have also been observed. A recurring manganic pneumonia and acute respiratory effects have been associated with chronic inhalation exposures to manganese. Effects on the nervous system include neurological and neuropsychiatric symptoms that can culminate in a Parkinsonism-like disease known as manganism;…"

- Reproductive effects of chronic inhalation exposure to manganese include decreased libido, impotence, and decreased fertility in men.

- Manganism is a progressive, disabling neurological syndrome that typically begins with relatively mild symptoms and evolves to include dull affect, altered gait, fine tremor, and sometimes psychiatric disturbances. Because some of these symptoms resemble those of Parkinson's disease, many investigators have used terms such as "Parkinsonian-like disease" and "manganese-induced Parkinsonism" to describe symptoms observed with manganese poisoning.

- As the disease progresses, walking becomes difficult and a characteristic staggering gait develops, the "cock walk", in which patients strut on their toes, with elbows flexed and the spine erect (Calne et al., 1997).

- Few data are available regarding the reversibility of these effects; they are thought to be largely irreversible."

- In some cases, psychological disturbances (manganese mania, manganese psychosis) precede or accompany the final stages of disease (Rodier, 1955; Mena et al., 1967; Cook et al., 1974; Mergler & Baldwin, 1997)."

- Following long-term or repeated exposure to manganese, humans may present neurological and neuropsychiatric disorders known under the term manganism."

- The health surveillance program of people exposed to manganese needs to include elements such as central nervous system disturbances (asthenia, anorexia, sleep problems, irritability, diminished libido)."

79.    Manganese poisoning occurs through inhalation, contact with skin, and ingestion.

80.    During and as a result of its various production processes, Defendant routinely discharges various toxic and hazardous substances, including, but not limited to, manganese, into the ambient air and thereby also to the soil in the vicinity of its Facility. Defendant has shown no signs of altering its behavior, complying with Federal or State environmental laws or otherwise being trusted to act responsibly.

81.    Pursuant to various Michigan statutes and common law, Defendant owes a duty to Plaintiffs and Class Members to refrain from discharging or releasing toxic and hazardous substances at excessive levels.

82.    Despite Defendant's air discharge control equipment, many of the contaminants discharged and released by the Defendant have been detected at levels that may constitute an imminent and substantial endangerment to the public health and welfare, significantly interfere with the enjoyment of life and of public and private property, exceed the federal initial screening level standards, exceed state soil exposure health standards, and damage public and private real and personal property.

83.    Unless Defendant's discharges and releases to the ambient air are stopped or significantly reduced, Defendant's future air discharges will continue to present the same endangerment, harm, interferences, exceedances, and damages.

## CLASS ACTION ALLEGATIONS

84.     Plaintiffs advance this class action on behalf of themselves and all others similarly situated as members of the proposed U.S. Steel Plaintiff Class.  The proposed Plaintiff Class, which Plaintiffs seek to represent, is defined as follows:

> All natural persons residing within the geographical boundaries of the Cities of River Rouge and Ecorse who have had their property rights significantly interfered with by air pollution discharged from Defendant's Facility.

85.     This action is brought and may be maintained as a class action pursuant to FRCP 23(a)(1)-(4), 23(b)(1), (2), or (3), and case law thereunder.

86.     Members of the Class are so numerous that joinder is impracticable.  Based on United States Census data from 2000, Plaintiffs believe that the number of Class Members exceeds 10,000.

87.     Class Members may be notified of the pendency of this action by published and/or mailed notice.  Fed. R. Civ. Pro. 23(c)(2).

88.     Common questions of law and fact exist as to all Members of the Class. These questions predominate over the questions affecting only individual Class Members.  These common legal and factual questions include, among other things:

> a. Whether Defendant's operation of the Facility has been and continues to be in violation of applicable Michigan environmental statutes and Michigan Nuisance law.
>
> b. Whether Defendant has released the air pollution found in Plaintiffs environment.
>
> c. Whether Plaintiffs and each Member of the Class are entitled to damages as a result of Defendant's violation of Michigan's environmental statutes and common law by discharging and releasing toxic and hazardous substances at excessive levels.

d.  The application of applicable law governing the claims asserted in the case.

e.  Whether Defendant's release of air pollutants is reasonable under the circumstances.

f.  What has been the involvement of other nearby industries?

g.  Common defenses asserted by Defendant.

h.  Use and application of experts, Defendant employees and governmental witnesses and documents.

89.    Plaintiffs' claims are typical of those of each Class Member because Plaintiffs, like every other Member of the Class, have been and continue to be exposed to Defendant's conduct, pollution, and are residents with the same legal property rights at stake, and the seek the same relief under the same causes of action as the other Members of the Class.

90.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Members of the Class they seek to represent; they have retained counsel competent and experienced in class action litigation and complex environmental litigation; and they intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and adequately protect the interests of Members of the Class.

91.    This action is certifiable under the provisions of FRCP 23(b)(1)(A) and/or (B) and/or (b)(3) because:

(A)  Individualized litigation presents a potential for inconsistent or contradictory judgments as important threshold questions such as the source of the pollution, the reasonableness of Defendant's conduct, the involvement of other industries, and the application of law and use of discovery;

(B)  The adjudication of the relevant issues will as a practical matter be dispositive of the interest of other class members not party to the adjudication, or substantially impair or impede such class member's

ability to protect their interests, again referring to the issues set forth above and ultimate questions of law and fact.

(C)    The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal, factual and environmental issues raised by defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the court by allowing the court to resolve numerous individual claims based upon a single set of proofs in a case where the individual cost of litigating these claims would make class action litigation more economical and cost effective than individual litigation.

## COUNT I
## VIOLATIONS OF THE MICHIGAN ENVIRONMENTAL PROTECTION ACT

92.    Plaintiffs incorporate the allegations set forth in the above paragraphs.

93.    As outlined above, scientific evidence accumulated to date conclusively demonstrates that USSGLW is releasing and discharging toxic and hazardous substances at excessive levels.

94.    In particular, the alarmingly high levels of manganese and other toxic and hazardous substances released and discharged by Defendant constitute an imminent and substantial endangerment to the Plaintiffs' and Class Members' health and welfare, cause irreparable harm to their health and welfare, interfere with their enjoyment of life and property, and damage their real and personal property.

95.    The amount of Defendant's continuing discharges of toxic and hazardous substances to the ambient air and soil substantially endanger and irreparably harm the public health and welfare and destroy unique, irreplaceable and fragile natural resources.

96.    The Michigan Environmental and Natural Resources Act (hereafter the

"Act") provides for various remedies, including payment of fines, money damages, and attorney fees, all of which are at issue and requested by Plaintiffs

97.     Defendant's discharges to the ambient air have contaminated Plaintiff's and Class Members property with levels of toxic and hazardous substances that exceed health-based standards prescribed by the state under the Act.

98.     The notice provisions of the Act requiring written notice to the Attorney General were complied with on March 24, 2004.  No response was received, and thus this action can be maintained pursuant to the Act.

### COUNT II
### NEGLIGENCE

99.     Plaintiffs incorporate the allegations set forth in the above paragraphs.

100.    Defendant owed Plaintiffs and Class Members a duty to act reasonably under the existing circumstances and not to unreasonably pollute the ambient air and soil.

101.    The frequency and amount of Defendant's discharges and releases of toxic and hazardous substances to the ambient air and soils breached said duty.

102.    Plaintiffs and Class Members' personal property, right to quiet enjoyment of real property, health and welfare and mental well being are being jeopardized as a direct and proximate result of Defendant's actions.

103.    Plaintiffs have suffered, and will likely continue to suffer non-economic and economic damages that are compensable under Michigan negligence laws, and Defendant is liable for those damages.

## COUNT III
## PRIVATE NUISANCE

104.    Plaintiffs incorporate the allegations set forth in the above paragraphs.

105.    Defendant's discharges of toxic and hazardous substances to the ambient air and soils have substantially and unreasonably interfered with the Plaintiffs and Class Members' use and enjoyment of their real and personal property.

106.    It is inevitable that if Defendant's discharges of toxic and hazardous substances to the ambient air and soils remain unchanged, they will constitute a continuing private nuisance.

107.    The court has the authority to remedy such present and future nuisances.

108.    Plaintiffs and Class Members are entitled to monetary compensation for their damages.

## COUNT IV
## MEDICAL MONITORING

109.    Plaintiffs incorporate the allegations set forth in the above paragraphs.

110.    Plaintiffs and Class Members are entitled to an Order requiring Defendants to pay for a reasonable system of monitoring the health of those people likely affected pursuant to published guidance and other medical registries.

111.    Plaintiffs and Class Members request the Court enter an Order for medical monitoring based upon evidence and findings submitted at a later date and received by the Court.

## RELIEF

WHEREFORE, Plaintiffs and Class Members demand:

A.    A finding by the court that Defendant's discharges to the ambient air and soils have been a nuisance that injured and damaged Plaintiffs and Class Members.

B.    A finding by the court that Defendant's discharges to the ambient air and soils were negligent and injured and damaged Plaintiffs and Class Members.

C.    An order requiring the Defendant to remediate all contamination of Plaintiffs and Class Members' real and personal property attributable to Defendant.

D.    An order requiring the Defendant to pay for a medical monitoring system and reimburse Plaintiffs and Class Members for their past and future health costs attributable to Defendant's actions.

E.    An order requiring the Defendant to reimburse Plaintiffs and Class Members for all damage to their real and personal property attributable to Defendant's actions and mental distress.

F.    Award costs interest and attorney fees.

G.    An Order appointing Charfoos & Christensen, P.C. and Berry Moorman, P.C. as Co-Class Counsel and certifying the action as a class action pursuant to terms the court finds just.

CHARFOOS & CHRISTENSON, P.C.
Jason J. Thompson  P-47184
L.S. Charfoos P-11799
Attorneys for Plaintiffs
5510 Woodward Avenue
Detroit, Michigan 48202
(313) 875-8080

_____

BERRY MOORMAN P.C.
Hugh B. Thomas P-40884
James P. Murphy P-36728
Attorneys for Plaintiffs
535 Griswold, Suite 1900
Detroit, Michigan 48226
(313) 496-1200

Dated: 11/30/04

### DEMAND FOR TRIAL BY JURY

NOW COME the Plaintiffs, by and through their counsel, CHARFOOS &

CHRISTENSEN, P.C., and hereby respectfully demands a trial by jury of the within cause

of action.

_____

CHARFOOS & CHRISTENSON, P.C.
Jason J. Thompson  P-47184
L.S. Charfoos P-11799
Attorneys for Plaintiffs
5510 Woodward Avenue
Detroit, Michigan 48202
(313) 875-8080

_____

BERRY MOORMAN P.C.
Hugh B. Thomas P-40884
James P. Murphy P-36728
Attorneys for Plaintiffs
535 Griswold, Suite 1900
Detroit, Michigan 48226
(313) 496-1200

Dated: 11/30/04

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

## I. (a) PLAINTIFFS

John Harrington, Andra Oundra and Karen Ward

(b) County of Residence of First Listed  Wayne

## DEFENDANTS

United States Steel Corporation, a Delaware Corporation

County of Residence of First Listed

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

74654

04 74654

(c) Attorneys (Name, Address and Telephone Number)

Jason Thompson (P47184)
5510 Woodward
Detroit, MI 48202
(313) 875-8080

Attorneys (If known)

PATRICK J. DUGGAN

MAGISTRATE JUDGE MONA K. MAJZOUB

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

|  | PLA | DEF |  | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment and Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### TORTS

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel And Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21: 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☒ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Nuisance

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE                    DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

X

# PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.　　　Other than stated above, are there any pending or previously
　　　　discontinued or dismissed companion cases in this or any　　☒ Yes
　　　　other court, including state court?  (Companion cases are　　☐ No
　　　　matters in which it appears substantially similar evidence will
　　　　be offered or the same or related parties are present and the
　　　　cases arise out of the same transaction or occurrence.)

If yes, give the following information:

Court: _EASTERN_____

Case No.: _04-74653_____

Judge: _AVERN CONN_____

Notes: