UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HARRINGTON, ANDRA OUNDRA, and
KAREN WARD, as Individuals and on behalf of
others similarly situated,

      Plaintiffs,

vs.                                     Civil Action No. 04-74654

UNITED STATES STEEL CORPORATION,      HON. AVERN COHN

a Delaware corporation,

      Defendant.

_____/

| | |
|---|---|
| L.S. CHARFOOS (P11799) | JACK O. KALMINK (P24087) |
| JASON J. THOMPSON (P47184) | MARY A. KALMINK (P42054) |
| IAN B. BOURGOINE (P63160) | Clark Hill PLC |
| Charfoos & Christensen, P.C. | Attorneys for Defendant |
| Attorneys for Plaintiffs | 500 Woodward Avenue, Suite 3500 |
| 5510 Woodward Avenue | Detroit, MI  48226 |
| Detroit, Michigan 48202 | (313) 965-8263 |
| (313) 875-8080 | |
| | DAVID A. BOWER (P38004) |
| HUGH B. THOMAS (P40884) | David A. Bower, P.C. |
| JAMES P. MURPHY (P36728) | Attorneys for Plaintiffs |
| Berry Moorman, P.C. | 10600 W. Jefferson, #204 |
| Attorneys for Plaintiffs | P. O. Box 18190 |
| 535 Griswold, Suite 1900 | River Rouge, MI   48218 |
| Detroit, Michigan 48226 | (313) 842-1292 |
| (313) 496-1200 | |

_____/

## PLAINTIFFS' MOTION FOR CERTIFICATION
## OF ACTION AS A CLASS ACTION

NOW COME the Plaintiffs, by and through their attorneys, CHARFOOS &

CHRISTENSEN, P.C., and BERRY MOORMAN P.C., and pursuant to Fed. R. Civ. P.

23 request that this Court issue an order certifying this action as a class action for the

reasons set forth in the attached brief.

/s/ Jason Thompson (w/ permission)
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Avenue
Detroit, MI 48202
(313) 875-8080
JThompson@c2law.com
P-47184

/s/James P. Murphy
BERRY MOORMAN, P.C.
535 Griswold, Suite 1900
Detroit, MI   48226
(313) 496-1200
murph@berrymoorman.com
P-36728

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HARRINGTON, ANDRA OUNDRA, and
KAREN WARD, as Individuals and on behalf of
others similarly situated,

                                    Plaintiffs,

vs.                                                      Civil Action No. 04-74654

UNITED STATES STEEL CORPORATION,
a Delaware corporation,                                  HON. AVERN COHN

                                    Defendant.

_____/

**L.S. CHARFOOS (P11799)**                    **JACK O. KALMINK (P24087)**
**JASON J. THOMPSON (P47184)**                **MARY A. KALMINK (P42054)**
**IAN B. BOURGOINE (P63160)**                 Clark Hill
Charfoos & Christensen, P.C.                  Attorneys for Defendant
Attorneys for Plaintiffs                      500 Woodward Avenue, Suite 3500
5510 Woodward Avenue                          Detroit, MI   48226
Detroit, Michigan 48202                       (313) 965-8263
(313) 875-8080

                                              **DAVID A. BOWER (P38004)**
**HUGH B. THOMAS (P40884)**                   David A. Bower, P.C.
**JAMES P. MURPHY (P36728)**                  Attorneys for Plaintiffs
Berry Moorman, P.C.                           10600 W. Jefferson, #204
Attorneys for Plaintiffs                      P. O. Box 18190
535 Griswold, Suite 1900                      River Rouge, MI   48218
Detroit, Michigan 48226                       (313) 842-1292
(313) 496-1200

_____/

## BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

### INTRODUCTION

   This is an air pollution case. Plaintiffs are residents who live near Defendant's

steel plant and who have endured years of air pollution fallout. The steel plant is very old and

operates broken equipment. Defendant has recently acknowledged to the Michigan Department

of Environmental Quality (MDEQ) that it is unable to comply with federal and state air pollution requirements. Recently, Defendant and the MDEQ have negotiated a Consent Order seeking to bring Defendant into compliance with air pollution regulations and laws over the next two years. There is no mystery surrounding the cause of the pollution involved in this case.

Despite the MDEQ Consent Order, one problem remains: compensating the residents who have endured a showering of air pollution released by Defendant. The steel manufacturing process produces well-known pollutants, including manganese. Furthermore, the process produces material called "kish," commonly described as a metal-like dust that covers everything within the fallout area. The residents of River Rouge and Ecorse have been showered with discharges of kish, particulate matter (PM) and other air pollution on a regular basis. They are forced to clean up Defendant's mess. The significant and unreasonable interference with the use and enjoyment of their property makes the residents' case a classic nuisance claim.

Plaintiffs seek compensation for damage to and interference with their property rights. This is not a personal injury case.[1] The case involves several complex factual and legal issues that are common to each resident and that predominate over individual issues. In addition, the lay and expert witnesses and documentary evidence in this case are extensive, and will apply to each resident's claim. In this brief, Plaintiffs will outline the pollution problem, explain the resulting effects on the residents of River Rouge and Ecorse, and establish that a Fed. R. Civ. P. 23(b)(3) class is the best method to adjudicate the case.

---

[1]To be clear, Plaintiffs seek mental distress damages, as pled. However, they are not alleging personal injuries, such as physical injury or disease, as in a traditional personal injury action.

## STATEMENT OF FACTS

### A.     The Steel Plant

On May 20, 2003, Defendant purchased the Great Lakes Steel Plant located in Ecorse and River Rouge, Michigan, through a bankruptcy proceeding initiated by the prior owner, National Steel Corporation (Exhibit A, 2004 MDEQ Staff Activity Report). The plant is now known as United States Steel, Great Lakes Works (USSGLW). It is located along the Detroit River in Ecorse and River Rouge, Michigan. It consists of approximately 1,100 acres, and has both steel making and finishing facilities. Sheet products primarily for use in the automotive industry are manufactured at Great Lakes Works.

During the steel-making process, iron ore and coke are combined with limestone in the blast furnaces. The molten iron that emerges is sent to basic oxygen furnaces, where steel scrap is added and carbon and other impurities are removed by the injection of oxygen during what is called a basic oxygen process or BOP. After leaving the "BOP shop," the steel is further refined before being poured into continuous casters, forming the slabs from which all flat steel products are made. Defendant's current annual raw steel-making capacity at USSGLW is 3.5 million tons.

The manufacturing process utilized by Defendant produces well-known pollutants, including manganese, benzene, chromium, copper, mercury, lead, and zinc to name a few (Exhibit B, TRI Data for 1996 - 2002). Furthermore, the process produces material called "kish".

## B.    Toxic Release Inventory Data

Pursuant to federal law, Defendant is required to report the identity and quantity of certain toxins released into the environment during its operation. The data, called Toxic Release Inventory (TRI) data, is maintained by the United States Environmental Protection Agency (EPA).[2] TRI data can be used to identify sources of pollution; determine quantities of emissions; measure progress in pollution control measures enacted from year to year; and assess potential environmental exposure and risk to public health.[3]

The 2002 TRI data is the most recent available to the public. Although Defendant did not assume ownership of the plant until 2003, the earlier data is still relevant here because it confirms what compounds were being emitted from the steel plant, and in what amounts.[4] The TRI data identifies manganese, benzene, chromium, copper, mercury, lead, and zinc as being released from the steel plant. For example, 10,700 lbs. of manganese compounds were released into the air in 2002; 8,600 lbs. in 2001; 9,400 lbs. in 2000; and 9,400 lbs. in 1999 (Exhibit B).

---

[2]This inventory was established under the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) and expanded by the Pollution Prevention Act of 1990.

[3]See http://www.deq.state.mi.us/tri.

[4]The manufacturing equipment and process used by USSGLW remain the same as what was used by National Steel when they operated the plant.

## C.    Operating Permits and Defendant's Violations

During the acquisition process, Defendant filed a petition requesting that the MDEQ transfer 120 air permits from National Steel to Defendant.[5] In the petition, Defendant filed a written statement for responsibility, stating "United States Steel Corporation understands and accepts the terms and conditions of the permits to install or permits to operate and any associated voluntary agreements, consent orders, or judgments". (Exhibit C, Permit Letters and List) In addition to the permits, several Consent Orders were in place that addressed fugitive dust and particulate emissions[6] (*Id.*).

One permit Defendant operates under is PTI No. 256-02 (Exhibit D), written to prevent the very damage complained of in this case. For example, General Condition 6 requires that operation of equipment not "cause unreasonable interference with comfortable enjoyment of life and property." General Condition 11 establishes opacity limits. Several Special Conditions require testing, monitoring, reporting, record keeping and maintenance, all to protect residents from excessive emissions of air pollution (*Id.*).

During 2003 and 2004, Defendant was cited for multiple permit violations and admitted that it was incapable of operating within its permit limitations. For example, on May 22, 2003, during air testing, a MDEQ investigator's car was covered in a wet coal-like material which he identified as coming from Defendant's coke battery quench tower (Exhibit A).

---

[5]Among the 120 permits were Permits to Install (PTI). Pursuant to Rule 201 of the Michigan Air Pollution Control Rules, a person must obtain an approved PTI for any potential source of air pollution unless the source is exempt from the permitting process. National Steel was operating under PTI C-7078 for its B Blast Furnace which operated a six-compartment baghouse system; PTI C-8326 to install three additional compartments to the original six-compartment system; and PTI No. 256-02 increasing the production limits of their three existing blast furnaces A, B and D, which included a special condition to test for PM within 1 year of commencing operation.

[6]Consent Order Nos. 27-1993, 28-1993, 8-1993 and WCAQMD No. 0035-97.

Defendant wrote a letter to the MDEQ and acknowledged that its coke oven baffles were broken and needed repair or replacement in order to comply with regulatory requirements (*Id*.). On October 14, 2003, Defendant admitted it could not get its baghouse to pass the PM limits test, even with new collection filters (*Id*.). On November 12, 2004, Defendant advised MDEQ that its B blast furnace casthouse control equipment could not maintain continuous compliance with particulate matter emission limits (*Id*.).

## D.    Air Testing

### 1.    The MDEQ Testing.

Ambient air sampling and testing shows how much of a compound is in the air at a given location in a given period of time. Federal and state pollution laws set limits for pollutant concentrations in ambient air. The MDEQ maintains an ambient air-sampling machine at 315 S. Genesee Street in River Rouge. The station samples for air pollutants such as VOCs, carbonyl compounds and metals (Exhibit E, 2000 MDEQ Annual Air Quality Report, Appendix C, p. 116).

### 2.    Plaintiff Testing.

The City of River Rouge has paid for accredited and industry-standard air testing within the City to determine whether Defendant has violated environmental laws and put the public at risk for health problems.[7] It hired Integrated Environmental, Inc., an environmental consulting company based in Livonia, Michigan, to conduct sampling pursuant to the American Society for Testing Materials (ASTM) standard. D 1739-98. Monthly samples were collected

---

[7]See Exhibit F, Affidavit of Rick Harding, Ph.D.

between October 31, 2003, and October 11, 2004. The sample test results are representative of particulate fallout from the air, and not the re-suspension substances present on the ground. The results indicated the presence of chromium, lead, manganese, zinc and copper to name a few (Exhibit F, Harding Affidavit).

**3.    Comparison of MDEQ and the City of River Rouge Test Data.[8]**

A comparison of the MDEQ test results and those from the City of River Rouge reveals a consistent picture, and confirms USSGLW is emitting excessive amounts of manganese into the air. For example, the number of samples with manganese present at the MDEQ station in 2000 was 27 of 27; in 2001, 48 of 48; in 2002, 54 of 54; and in 2003, 55 of 55. Similarly, the number of samples with manganese present at the City testing station in 2000 was 3 of 3; in 2003, 15 of 15; and in 2004, 28 of 28. Moreover these, tests show concentrations of the toxic substance manganese in amounts that far exceed the applicable health standard over several years:

- In 2000, at least 6 samples had excessive levels of manganese.
- In 2001, at least 3 samples had excessive levels of manganese.
- In 2002, at least 3 samples had excessive levels of manganese.
- In 2003, at least 4 samples had excessive levels of manganese.
- In 2004, 21 of 43 samples had excessive levels of manganese.

_____

[8]Comparisons were performed by Rick Harding, Ph.D.

### E.    MDEQ Citations

Defendant's ongoing practice of polluting the local air has not gone unnoticed. The EPA and the MDEQ have cited Defendant for several violations of permits and the Clear Air Act since the it assumed control of the facility in 2003 (Exhibit G, MDEQ and U.S. EPA Letters of Violations). The violations all concern U. S. Steel's refusal to update equipment  and/or properly control its air emissions of kish and PM.[9] According to the MDEQ, U.S. Steel pollutes the local air and violates air emissions standards because of its failure to ". . . install, maintain and operate in a satisfactory manner proper air pollution control equipment. . ." (*Id*) Defendant's violations even resulted in the dubious distinction of being named on the U. S. Environmental Protection Act's High Priority Violators List in 2004.

### 1.    Opacity.

Generally, an opacity test measures the amount of light that passes through an air sample. PM is measured by opacity tests. The lower the levels of measurable light, the greater the PM level.

The MDEQ has established opacity limits with which USSGLW must comply. Defendant cannot maintain compliance, and has received several Letters of Violations from the MDEQ. On April 1, 2004, visible emissions for the furnace were greater than the 20% opacity

---

[9]According to the MDEQ, PM is associated with serious health effects, increased hospital admissions and emergency room visits for people with heart and lung disease, and work and school absences; is the major source of haze that reduces visibility in many parts of the United States, including our national parks; settles on soil and water and harms the environment by changing the nutrient and chemical balance; causes erosion and staining of structures including culturally important objects such as monuments and statues; and causes health problems for sensitive people which can get worse if they are exposed to high levels of PM for several days in a row.

limit. The six-minute average reading from the Basic Oxygen Furnace was 51.25%, which is more than 2.5 times the acceptable limit of 20%. The roof monitors recorded a 100% opacity reading with a "thick brownish color." (Exhibit G)

On April 20, 2004, the MDEQ issued another Letter of Violation to Defendant. Again, the testing showed violations of opacity limits. The six-minute opacity reading observed from the ESP stack was 56.4, which is almost 3 times the acceptable limit of 20% (*Id.*).

On August 17, 2004, the six-minute average opacity reading was 63.125%, which is more than 3 times the acceptable limit, and on August 18, 2004, the six-minute average reading was 77.50%, which is almost 4 times the acceptable limit. Defendant was instructed to take corrective action but the problem went uncorrected (*Id.*).

On June 28, 2004, Defendant was sent another Letter of Violation from the MDEQ. This time, there was a visible emission from Defendant's BOF electrostatic precipitator stack. The six-minute average opacity reading was 81.88%, which is more than 4 times the acceptable limit of 20% (*Id.*).

## 2.    **Defendant's BOF Problems.**

On August 28, 2004, Defendant was sent yet another Letter of Violation from the MDEQ (*Id.*). Two more visible emissions from Defendant's BOF electrostatic precipitator stack exceeded the permit limits.

On October 4, 2004, Defendant was again sent a Letter of Violation for excessive air emissions (*Id.*). This time, tests performed on the Blast Furnace D for fugitive dust emissions revealed a lack of compliance with applicable limits.

11

3.    **Consent Order**.

Finally, after all the citations and violations, Defendant agreed to entry of a Consent Order (Exhibit H). The plan of correction will take at least two years to complete. It includes a $950,000.00 fine payable to the State of Michigan, and potential assessment of future fines of up to $5,000 for each violation of the Order (*Id*.). The Order provides this court with a good description of Defendant's historic pollution problems and the corrective action it has agreed to undertake in order to stay in operation.

F.    **Public Health**.

Although this is not a personal injury case, the threat of injury is a recognized basis to bring a nuisance action in Michigan.[10]  Defendants release of  PM and manganese pose potential health risks to the residents living nearby. First, some of the most dangerous particulate to human health is the PM-10 fraction (*i.e.*, "respirable"; Particulate Matter with a nominal aerodynamic diameter of 10 microns).[11] The City of River Rouge testing reveals the existence of manganese in the PM-10 fraction at a concentration that exceeds the health standard.

Second, the public health risks of manganese are well known. Of significance is the risk of respiratory and pulmonary harm and a Parkinson-like condition identified by the medical community as manganism.  Manganism has been documented for over 100 years. Manganism causes neurological disruption and symptoms similar to those associated with

---

[10](*See, Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 303-04; 487 N.W.2d 715, 720 (Mich.1992) ("There are countless ways to interfere with the use and enjoyment of land including . . . [the] threat of future injury that is a present menace and interference with enjoyment.").

Parkinson's Disease. The EPA's Office of Air Quality Planning and Standards, for a hazard ranking under Section 112(g) of the Clean Air Act Amendments, considers manganese to be a "high concern" pollutant based on severe chronic toxicity.[12] The World Health Organization Geneva, 1999 report entitled, *Manganese and Its Compounds, Concise International Chemical Assessment Document 12,* was published under the joint sponsorship of the United Nations Environment Programme, the International Labour Organization, and the World Health Organization. It reported as follows:

- In chronic inhalation exposure to manganese, the main organ systems affected are the lungs, nervous system, and reproductive system, although effects on other organ systems have also been observed. A recurring manganic pneumonia and acute respiratory effects have been associated with chronic inhalation exposures to manganese. Effects on the nervous system include neurological and neuro-psychiatric symptoms that can culminate in a Parkinsonism-like disease known as manganism.

- Reproductive effects of chronic inhalation exposure to manganese include decreased libido, impotence, and decreased fertility in men.

- Manganism is a progressive, disabling neurological syndrome that typically begins with relatively mild symptoms and evolves to include dull affect, altered gait, fine tremor, and sometimes psychiatric disturbances. Because some of these symptoms resemble those of Parkinson's disease, many investigators have used terms such as "Parkinsonian-like disease" and "manganese-induced Parkinsonism" to describe symptoms observed with manganese poisoning.

---

[11]PM10 refers to all particles less than or equal to 10 micrometers in diameter. A particle 10 micrometers in diameter is about one-seventh the diameter of a human hair. Those less than 10 micrometers in diameter (PM10) are so small that they can get into the lungs, potentially causing serious health problems.

- As the disease progresses, walking becomes difficult and a characteristic staggering gait develops, the "cock walk", in which patients strut on their toes, with elbows flexed and the spine erect (Calne et al., 1997).

- Few data are available regarding the reversibility of these effects; they are thought to be largely irreversible.

- In some cases, psychological disturbances (manganese mania, manganese psychosis) precede or accompany the final stages of disease (Rodier, 1955; Mena, *et al*., 1967; Cook, *et al*., 1974; Mergler & Baldwin, 1997).

- Following long-term or repeated exposure to manganese, humans may present neurological and neuropsychiatric disorders known under the term manganism.

### G.    <u>Citizen Complaints</u>

Plaintiffs routinely observe kish falling from the sky and coating their homes, cars and outdoor furniture. The kish finds its way into the residents' homes, covering their personal property. Not surprisingly, given Defendant's refusal to take corrective action to reduce air pollution emitted from its facility, local residents have complained to state and local authorities (Exhibit I, Citizen Complaints).

Several National Response Center Incident Reports have been filed by Defendant as a result of its air pollution (*Id*.). The reports reveal that equipment and/or personnel failures resulted in emissions and leaks of dangerous chemicals such as benzene, coke oven failures, coke oven gas releases and other problems all documented in public records (*Id*.).

---

[12]U.S. Environmental Protection Agency. Technical Background Document to Support Rulemaking Pursuant to the Clean Air Act Section 112(g). Ranking of Pollutants with Respect to Hazard to Human Health. Emissions Standards Division, Office of Air Quality Planning and Standards, Research Triangle Park, NC. 1994.

Complaints have been logged with the Pollution Emergency Alert System (PEAS) describing "a huge plume of smoke orange in color moving into Canada" from Defendant's plant (*Id.*).

On June 25, 2004 the Canadian Ministry of the Environment investigated complaints of "metallic like fallout" on vehicles in LaSalle, Ontario. The police collected samples for testing. The material was graphite with iron oxide, known as "kish flakes," which is typical of a steel foundry (*Id.*).

On June 14, 2003, an Ecorse resident filed a complaint with the MDEQ regarding her house, car and body being covered with "kish." Samples of shinny particles were collected from inside her house and pictures were taken. Test results again confirmed metallic oxide particles (kish) (*Id.*).

On May 15, 2003, two Ecorse residents filed complaints with the MDEQ. One resident reported that while hosting an outdoor dinner, a "mist of metal shavings" fell from the sky. It was described "like pencil lead." It "contaminated the food and landed everywhere." The other resident described the situation "like it was snowing graphite." He said the fallout landed on cars, lawns, and sidewalks (*Id.*).

The residents living near USSGLW have unfairly suffered through several years of air pollution emitted from the steel plant. In fact, in 2001, The City of River Rouge and several residents affected by the pollution filed suit against National Steel.[13] Then when U.S. Steel took control of the plant, the City tried to initiate dialogue with Defendant in an effort to

---

[13]Plaintiff counsel Charfoos & Christensen represented the claimants in that case. Due to National Steel bankruptcy, that case was never fully litigated. Recently the bankruptcy court approved a claim for the city and class in the amount of $38,750,000. The creditors committee anticipates payment of the claim this year at 1.5%, or $581,250.00.

create a cooperative relationship, especially as to controlling air pollution (Exhibit J, Joseph Affidavit). Defendant did not respond. It produced record amounts of steel, and the pollution was worse than ever.

Air pollution emitted from Defendant's plant has caused property damage, potential health risks and nuisance damages in violation of Federal and State Law.[14] This case is the natural continuation of the efforts of many residents and government officials to bring the USSGLW into compliance with both environmental laws, and the laws of good corporate citizenry.[15]

## LAW AND ARGUMENT

### I
### CLASS ACTION CERTIFICATION UNDER
### RULE 23(a) IS PROPER.

Plaintiffs move to certify their negligence and nuisance claims for money damages as a result of Defendant's interference with their property rights.[16]

_____

[14]MCLA § 324.5501 defines (a) "Air contaminant" as a dust, fume, gas, mist, odor, smoke, vapor, or any combination thereof; and (b) "air pollution" as the presence in the outdoor atmosphere of air contaminants in quantities, of characteristics, under conditions and circumstances, and of a duration that are or can become injurious to human health or welfare, to animal life, to plant life, or to property, or that interfere with the enjoyment of life and property in this state, and excludes all aspects of employer-employee relationships as to health and safety hazards.

[15]The National Steel settlement only involved the years that the steel plant was owned and operated by National Steel and specifically excluded the instant case and U.S. Steel (Exhibit K). This case is limited to the period of operation by U.S. Steel, that is, from May 20, 2003, going forward. Therefore, the damage claim in this case is limited to damages caused from May 20, 2003 going forward. The National Steel settlement funds will be received by the City of River Rouge to spend on appropriate pollution remediation projects connected to the pollution caused by National Steel, and are not going to compensate residents due to the inefficiencies of administrating such a distribution.

[16]Plaintiffs are not seeking class certification of their medical monitoring claim at this time. That cause of action was pled to preserve the claim. The Michigan Supreme Court has held oral argument on the issue of whether medical monitoring claims exist in Michigan in the Dow Chemical Dioxin case. Their decision is expected within six months and will obviously affect this case. Likewise, the MDEQ Consent Order renders Plaintiffs' MEPA claim moot to the extent MEPA authorizes injunctive relief to stop further pollution.

**A.    Class Definition.**

Plaintiffs propose a class consisting of the following people:

> All natural persons residing in single family units within the geographical boundaries of the Cities of River Rouge and Ecorse as of May 20, 2003 whose property rights have been violated by toxic pollutants and contaminants released by U.S. Steel, Great Lakes Works.[17]

A class defined by geographical boundaries is an acceptable method for defining a class in an environmental air pollution case.[18] *Olden v. LaFarge Corp* , 383 F.3d 495 (6th Cir. 2004).

**B.    Federal Rule of Civil Procedure 23(a) Analysis.**

To certify a Fed. R. Civ. P 23 class action, the court must find that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). District Courts have broad discretion in deciding whether an action may be maintained as a class action within the framework of Fed. R. Civ. P. 23. *In re: American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

In addition to the Plaintiffs' burden of proving all the certification requirements set forth in Fed. R. Civ. P 23(a) they must also establish at least one element of Fed. R. Civ. P

---

[17]Specifically excluded from the plaintiff class are federal judges and magistrates and their immediate families, U.S. Steel, any parent, subsidiary or affiliate of U.S. Steel Corporation, any entity in which U.S. Steel Corporation has a controlling interest, and U.S. Steel Corporation's officers, directors, employees and their immediate families.

[18]Plaintiffs also rely on *Olden*, *supra*, on the question of aggregating damages for subject matter jurisdiction under 28 U.S.C.§ 1387.

23(b). <u>General Tel. Co.</u> v. <u>Falcon</u>, 457 U.S. 147, 161 (1982). A Rule 23(b)(3) class action is appropriate where:

> [T]he court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

For the purposes of this motion, the Court must accept the substantive allegations in the Plaintiffs' complaint as true.[19] *Eisen v. Carlisle Jacquelin*, 417 U.S. 156, 177-78 (1974). In evaluating the elements of Fed. R. Civ. P. 23, the Court should error on the side of certifying the class. *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968).

### 1.    The Plaintiff Class Is So Numerous That Joinder of Its Members Is Impractical.

Plaintiffs must show that the putative class is so large that joinder of all members would be impracticable. Courts, and commentators, have recognized that the sheer number of potential litigants in a class, especially if more than several hundred, can be the only factor needed to satisfy Rule 23(a). *Bacon v. Honda American Mfg., Inc.*, 370 F.3d 454, 570 (6th Cir.

---

[19] For purposes of class certification, the order, the TRI data and the testing performed by Plaintiffs together provide sufficient insight into the factual assertions of Plaintiffs' complaint and the Court may decide the question of class certification. *Eisen v Carlisle Jacquelin, 417 U.S. 156, 177-178 (1974).*

2004) (citing 1 Newberg and Alba Conte, *Newberg On Class Actions*, § 3.5, at 243-45 (4th Ed. 2002)).

In the case at bar, numerosity is satisfied on the sheer numbers alone. The class definition includes residents within the geographic boundaries of the Cities of Ecorse and River Rouge. 2000 U.S. census data indicates that there are 11,229 residents and 3,444 single-family homes in the City of Ecorse, and 9,917 residents and 2,563 single-family homes in River Rouge. Joinder of the claims of all the residents of these two cities is impractical under Fed. R. Civ. P. 23(a)(1). *Bacon*, *supra*, at 570 (holding that a class of 800 members makes joinder impossible).

### 2.    There Are Questions of Law and Fact Common To The Plaintiff Class.

The second prong of Fed. R. Civ. P. 23(a) is commonality. There need only be one question common to the class for commonality to be satisfied, as long as the question advances the litigation. *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). Furthermore, the "commonality" threshold is not high, but only requires that a resolution of the common questions will affect a substantial number of class members. *Jenkins v. Raymark Ind.*, 782 F.2d 468, 472 (5th Cir. 1986).

In this case, Plaintiffs' allege that Defendant has interfered with their property rights through air pollution emissions, amounting to a nuisance. A private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land. 4 Restatement Torts, 2d, § 821D, p. 100. The essence of private nuisance is the protection of a property owner's reasonable comfort in occupation of the land in question. Prosser & Keeton, *supra,* p. 619. It involves "not only a defect, but threatening or impending danger . . . to the property rights or

health of persons sustaining peculiar relations to the same. . . ." *Kilts v. Kent Co. Supervisors*,

162 Mich. 646, 651, (1910).[20] (Thus the manganese levels are a relevant issue).

The Michigan Supreme Court summarized:

> There are countless ways to interfere with the use and enjoyment
> of land including interference with the physical condition of the
> land itself, disturbance in the comfort or conveniences of the
> occupant including his peace of mind, and threat of future injury
> that is a present menace and interference with enjoyment.
>
> *Adkins v. Thomas Solvent Co.*, 440 Mich 293, 303-04 (1992).

The following four common questions will be fundamental to the success of all

putative class members:

- Whether U.S. Steel's operations have violated applicable air pollution standards, limits, permits or other laws.

- Whether U.S. Steel has been negligent in its operation and emissions.

- Whether the air pollution condition created by U.S. Steel constitutes a nuisance under Michigan nuisance law.[21]

- Whether U.S. Steel was the source of the air pollution found in Plaintiffs' environment.[22]

---

[20]The manganese levels exceeding public health standards constitute a basis to find significant interference of property rights under Michigan nuisance law. While this is not a personal injury case, the threat of personal injury vis-à-vis pollution constitutes a real and significant violation of property rights. *Sterling v. Veliscol*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Adkins v. Thomas Solvent Co.*, 440 Mich 293, 303-304(1992) ("There are countless ways to interfere with the use and enjoyment of land including . . . [the] threat of future injury that is a present menace and interference with enjoyment.").

[21]If the class can show that their properties were frequently covered by cement dust, this would likely be enough to establish "significant harm." *See, e.g., Adams v. Cleveland Cliffs Iron Co.,* 237 Mich. App. 51, 70 (1999) ("If the quantity and character of the dust are such as to disturb the ambiance in ways that interfere substantially with the plaintiff's use and enjoyment of the land, then recovery in nuisance is possible."). Further, if the class can show that they are at an increased risk of significant future medical problems, this too would likely constitute "significant harm."

[22]This is a question of general causation which was discussed in *Sterling*, *supra* at 1200 and found to be a valid basis to certify a FED.R.CIV.P 23(b)(3) class.

The answers to these four common questions will advance the litigation because they will determine whether Defendant has wrongfully emitted pollution that has entered local residents' property and caused interference with their property rights. If the answer is "yes" to any of the four questions, that answer will apply to, and thus advance the litigation for, the entire class.

The first and second common questions relate to Defendant's common course of conduct of violating applicable state and federal emissions standards. A common course of conduct affecting all class members alike has been held to create a common legal and factual issues. *Sterling, et al v. Veliscol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (where the defendant's liability can be determined on a class-wide basis because of the defendant's common course of conduct, a class action may be the best vehicle to resolve the controversy); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) ("Where the lawsuit challenges a . . . practice or policy that affects all of the putative class members . . . commonality is present."). Here, Defendant has a practice of violating state and federal emissions standards by emitting excessive air pollution (Exhibits, A, G and H). When U.S. Steel violates emission standards, the putative class members are damaged because the air pollution invades their property and homes, creating a nuisance.

The third and fourth common questions relate to air pollution as a nuisance. Both Sixth Circuit and Michigan courts have analyzed the commonality element in the environmental pollution context and certified class actions in which manufacturers interfered with property rights of local homeowners. In *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), residents brought a class action against the owner of a cement manufacturing plant located in Alpena, Michigan. *Id.*, at 497. The plaintiffs alleged that emissions from the plant trespassed on their

property, created a nuisance, and arose from the plant's negligence. *Id.*, at 497-498. The Federal District Court for the Eastern District of Michigan certified the case as a class action. *See*, *Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001). The cement plant appealed, arguing that common issues did not predominate due to individual causation and damage issues. *Olden*, 383 F.3d at 508. The Sixth Circuit disagreed, and recognized that the paramount issue was ". . . the common argument that the class's properties are regularly covered with cement dust, causing minor property damage and a predictable reduction of . . . the enjoyment of the property." *Id.*, at 509.

Similarly, in *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir. 1988), the District Court certified a class of residents who alleged that a local chemical company's waste burial site caused residents to suffer personal and property damage. On appeal, the Sixth Circuit noted that each class member lived in the local area of the landfill and allegedly suffered damages as a result of the defendant's waste burial site. *Id.*, at 1197. The Court held that because almost identical evidence would be required to establish the defendant's liability for the class members' injuries, class certification was appropriate. *Id.* Individual questions of damages could properly be preserved for subsequent proceedings. *Id.*

Michigan State courts have also recognized that common issues exist in environmental cases similar to the instant case. In *Oakwood Homeowners Assoc. Inc. v. Ford Motors Co.*, 77 Mich. App. 197; 258 N.W.2d (1977), the Michigan Court of Appeals upheld class certification in a case involving claims that air pollution from the defendant's facility violated air pollution laws and impaired the comfort and enjoyment of local residences in southwest Detroit. The court held:

> This Court finds a tremendous parity of issues regarding air
> pollution: (1) whether defendants' distinct operations have violated
> and continue to violate local, state and Federal air pollution
> standards, and (2) whether the various Defendants have released
> and continue to release contaminants which "substantially impair
> the comfort or enjoyment of adjacent issues. (internal citations
> omitted). While other issues, of course exist which distinguish the
> claimants, these can be considered separately after resolution of the
> foregoing common questions of liability.

*Id.*, at 214-215.

The named Plaintiffs' air pollution case is identical to the claims of the putative

class members' case in every meaningful way. The element of commonality is met under Fed. R.

Civ. P 23(a), and class action certification is proper based on both Federal and Michigan

nuisance and class action case law.

3.    **The Claims and Defenses of the Representative Parties
Are Typical of the Claims and Defenses of the Class.**

The third prong set forth in Fed. R. Civ. P. 23(a) is typicality. A claim is typical in

the class context if the claims of the class representatives arise from the same event or course of

conduct that gives rise to the claims of the class, and if the claims are based on the same legal

theory. *Olden*, 203 F.R.D. at 269. The test for typicality, like commonality, is not demanding and

does not require identical claims. *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 844 (6th Cir.

1997) (citing *Forbush v. J.C. Penny, Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). "Since the

claims only need to share the same essential characteristics, and need not be identical, the

typicality requirement is not highly demanding." 5 Moore's Federal Practice, § 23.24[4], at 23-

95 – 23-96. Plaintiffs meet the typicality requirement by showing that the same allegedly

unlawful conduct affected the named plaintiffs and class members. *Dura-Bilt Corp. v. Chase Manhattan Bank*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981).

The class representatives, and the class members, bring the same complaint that Defendant emits excessive amount of PM and kish, which substantially interferes with their use and enjoyment of their property. The claims of the representatives and class members are based on the same legal and factual premises: USSGLW's failure to adhere to applicable state and federal emission standards causes a nuisance. Given that the class representatives and the putative class share the same complaints regarding U.S. Steel's violation of state and federal emission standards, the claims of the class representatives are typical of the class as a whole. Fed. R. Civ. P. 23(a)(3). There is nothing unique to either the class representatives or any member of the putative class such that either group would be atypical of the other.

### 4.    Plaintiffs and Their Counsel Will Fairly and Adequately Protect The Interests of The Class.

The adequacy prong of Fed. R. Civ. P. 23(a) contains two questions for analysis: (1) Do named plaintiffs and their counsel have conflicts of interest with other class members? *In re; American Medical Systems*, 75 F.3d 1069, 1083 (6th Cir. 1996); (2) will named plaintiffs and their counsel prosecute the action vigorously on behalf of the class through qualified counsel? *Id.*

Plaintiffs here have no conflicts with the putative class members. Plaintiffs, like their class member counterparts, simply share a desire to hold Defendant responsible for substantially interfering with the use and enjoyment of their property. Likewise, class counsel will provide zealous, competent and ethical representation of the class throughout the proceedings. Attorneys from Charfoos & Christensen have joined with attorneys from Berry Moorman, P.C. to

prosecute this case. Plaintiffs' counsel posses the experience and competence to provide strong representation to all class members in class action environmental tort litigation. The adequacy requirement is clearly satisfied.

### C. Fed. R. Civ. P 23(b)(3) Analysis

#### 1. Common Questions of Law and Fact Predominate Over any Individual Issue.

Rule 23(b)(3) is concerned with achieving the economies of time, effort, and expense. *Olden*, 203 F.R.D. at 270. In this case, Defendant's liability hinges on its course of conduct vis-à-vis the class. As recognized in *Olden*, *Sterling*, and *Oakwood*, *supra*, common issues predominate in air pollution cases when the paramount issue concerns whether the plant's emissions are substantially interfering with the local residents' use and enjoyment of their properties. Thus, while individual issues may exist, these individual issues do not preclude certification, because they can be determined after adjudicating the central issue of Defendant's liability and general causation. The <u>Sterling</u> court also explained this concept well as follows:

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy. *Sterling*, *supra*, at 1197.

Without question, deciding liability and general causation will consume the vast majority of the time, evidence and witness presentation, and expense involved in this case.

Furthermore, the air testing and pollution data, experts on pollution, steel-making and dispersion modeling, and the MDEQ witnesses and documents, will all be utilized for each resident in the putative class definition. Defendant's common course of conduct in creating air pollution and the evidence necessary to demonstrate that conduct and resulting pollution, predominate over individual issue such as damages.

### 2. A Class Action Is the Superior Method To Resolve This Matter.

The last requirement set forth in Fed. R. Civ. P. 23(b)(3) is superiority. There are four factors to consider in analyzing the superiority requirement:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3).

Each of the above factors favors granting Plaintiffs' motion for certification. First, the putative class members cannot realistically prosecute separate actions because the amount of recovery in an individual nuisance suit will be dwarfed by the costs of the litigation. (See, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 616 (1997))  And the costs associated with retaining the necessary scientific experts and conducting ambient air testing.[23] Second, it is desirable to concentrate this litigation in this forum so that the parties can resolve their disputes in a fair, efficient and equal fashion. Lastly, there are few difficulties to be encountered in the

---

[23]The City of River Rouge has already spent over $150,000 in testing and expert analysis.

management of a class action in this case. The class definition, defined above, will ensure a fair and efficient method for determining who is in the class. Further, because the legal issues are common, any individual issues that may be present are easily managed by bifurcating liability from the issue of damages.[24] *Olden*, *supra*, at 270-271. A variety of trial plans can be adopted from prior air pollution cases or from the *Manual For Complex Litigation, Fourth*. As a result, class action treatment is the superior method for adjudicating this air pollution case because it is the only fair and efficient method for the residents of Ecorse and River Rouge can seek common relief from the air pollution that is emanating from U.S. Steel's facility.

### D.    Fed. R. Civ. P 23(g) Analysis

Plaintiffs' counsel have requested that the Court appoint Charfoos & Christensen, P.C. and Berry Moorman, P.C. as class counsel. If the Court grants the motion to certify the class, under Fed. R. Civ. P 23 (g), the Court is required to analyze several factors before appointing class counsel. At this time, Plaintiffs' counsel are not aware of any other attorneys competing for appointment as class counsel in a federal court case, but another similar case has been filed in Wayne County Circuit Court. If that case is removed, Plaintiffs' counsel would request the opportunity to submit a separate brief addressing the Fed. R. Civ.P 23(g) factors and petitioning the Court for appointment as lead class counsel in this case.

---

[24]In response, Defendant will likely argue that the effect of the air pollution of each class member will bog down the proceedings and overwhelm the case. However, no matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. *Sterling*, *supra*, at 1197. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible. *Id.*

## CONCLUSION

Plaintiffs have demonstrated that large groups of people have been adversely effected by Defendant's well-known air pollution problem. Further, Plaintiffs have shown that each of the prerequisites for class certification under Fed. R. Civ. P 23(a) and (b)(3) is satisfied.   Several other federal and state courts have certified property damage air pollution cases that are very similar to the instant case.  In short, this is a model case for the application of the class action mechanism.

The case challenge practices that are widespread and involve prohibitive expenses if pursued individually yet are too significant in the aggregate to be ignored.  Defendant has created an unsafe, unhealthy atmosphere that interferes with the use and enjoyment of property. Although the MDEQ may have finally gotten Defendant's attention and ended its continued pollution, it is vitally important to the residents effected by the pollution that they be compensated for the resulting interference with sacred rights, the right to quite enjoyment of ones property and home.

s/ Jason Thompson (w/ permission)          s/James P. Murphy
CHARFOOS & CHRISTENSEN, P.C.          BERRY MOORMAN, P.C.
5510 Woodward Avenue                         535 Griswold, Suite 1900
Detroit, MI 48202                                   Detroit, MI   48226
(313) 875-8080                                      (313) 496-1200
JThompson@c2law.com                        murph@berrymoorman.com
P-47184                                               P-36728


Dated:  March 29, 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HARRINGTON, ANDRA OUNDRA, and
KAREN WARD, as Individuals and on behalf of
others similarly situated,

     Plaintiffs,

vs.                                                                          Civil Action No. 04-74654

UNITED STATES STEEL CORPORATION,
a Delaware corporation,                                      HON. AVERN COHN

     Defendant.

_____/

| | |
|---|---|
| L.S. CHARFOOS (P11799) | JACK O. KALMINK (P24087) |
| JASON J. THOMPSON (P47184) | MARY A. KALMINK (P42054) |
| IAN B. BOURGOINE (P63160) | Clark Hill PLC |
| Charfoos & Christensen, P.C. | Attorneys for Defendant |
| Attorneys for Plaintiffs | 500 Woodward Avenue, Suite 3500 |
| 5510 Woodward Avenue | Detroit, MI  48226 |
| Detroit, Michigan 48202 | (313) 965-8263 |
| (313) 875-8080 | |
| | DAVID A. BOWER (P38004) |
| HUGH B. THOMAS (P40884) | David A. Bower, P.C. |
| JAMES P. MURPHY (P36728) | Attorneys for Plaintiffs |
| Berry Moorman, P.C. | 10600 W. Jefferson, #204 |
| Attorneys for Plaintiffs | P. O. Box 18190 |
| 535 Griswold, Suite 1900 | River Rouge, MI  48218 |
| Detroit, Michigan 48226 | (313) 842-1292 |
| (313) 496-1200 | |

_____/

## <u>CERTIFICATE OF SERVICE</u>

STATE OF MICHIGAN )
                    )ss
COUNTY OF WAYNE  )

     I hereby certify that on the 29th day of March, 2005, copies of the foregoing Plaintiffs' Motion for Certification of Action as a Class Action were filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

     I certify that I have mailed by United States Postal Service the above documents to the following non-ECF participant:

           DAVID A. BOWER
           10600 W. Jefferson, #204
           P.O. Box 18190
           River Rouge, MI  48218

Respectfully submitted,

BERRY MOORMAN P.C.


/s/   James P. Murphy
Attorneys for Plaintiffs
535 Griswold, Suite 1900
Detroit, MI   48226
(313) 496-1200
murph@berrymoorman.com
P-36728


Date:   March 29, 2005